UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ROBERT MOORE, et al.,

     Plaintiffs,

v.                                                    CASE NO. 1:08-CV-1167

MENASHA CORPORATION,                HON. ROBERT HOLMES BELL

     Defendant.

_____/


## OPINION

At its core, this is a breach of contract action.  Plaintiffs, retired employees of

Defendant Menasha Corporation and their spouses, argue that Defendant promised them

lifetime health insurance benefits and then reneged on that promise.  Because the alleged

promise appears in two separate collective bargaining agreements ("CBA") that are also

ERISA-qualified welfare benefits plans, Plaintiffs bring suit under Section 301 of the Labor

Management Relations Act ("LMRA"), 29 U.S.C. § 185, and Section 502(a)(1)(B) of

ERISA, 29 U.S.C. § 1132(a)(1)(B).  Even though two separate statutes authorize Plaintiffs'

suit, "the LMRA claim-essentially a breach of contract allegation-determines the outcome

of the ERISA claim because 'if the parties intended to vest [retirement health benefits] and

the agreement establishing this is breached, there is an ERISA violation as well as a LMRA

violation."  *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 363 (6th Cir. 2009)

(quoting *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000)).

On October 22, 2009, Defendant filed a motion for summary judgment on Plaintiffs' claims, arguing that, as a matter of law, it did not breach a promise to provide Plaintiffs with lifetime health insurance benefits. (Dkt. No. 27.) On November 18, 2009, Plaintiffs filed a motion for summary judgment on their claims, arguing that, as a matter of law, Defendant did breach a promise to provide them with lifetime health insurance. (Dkt. No. 29.) This matter is before the Court on these competing motions for summary judgment.

## I. Factual Background

Defendant Menasha describes itself as "a privately held, family-owned corporation engaged in business-to-business service of niche-based packaging, marketing and logistics." (Dkt. No. 28, Def.'s Mot. 2.) Menasha is headquartered in Neenah, Wisconsin, but it owns and operates a small facility in Coloma, Michigan. Plaintiffs Robert Moore, Eleanor Rhodes, Gustave Peppel and Victor Adams were all employed by Menasha at its Coloma facility, and while employed they were members of the United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial and Service Workers International Union ("USW") (f/k/a United Paperworkers International Union). Between 1994 and 2002, USW negotiated two collective bargaining agreements with Defendant, one in effect from June 16, 1994 to June 16, 1997 ("1994 CBA"), and one in effect from June 16, 1997 to June 16, 2002 ("1997 CBA").

The 1994 CBA contained several provisions addressing the health benefits available to employees and former employees. Section 3(b) of Article XV provided that, "[e]ffective

2

August 1, 1994," employees and their dependents would be entitled to the "Blue Cross/ Blue Shield of Michigan [policy], premium to be paid at 100% by [Defendant]." (Dkt. No. 28 Ex. 1, at 36.) Section 7(a) provided: "Employees reaching the age of 62 during the term of this agreement shall be provided coverage under the Blue Cross/ Blue Shield of Michigan Plan. These employees will pay 20% of the premium for this coverage until they reach age 65. At that time, company will pay 100% of premium for this coverage." (*Id.* at 37.) Section 7(b) provided: "Effective July 1, 1997 the company will provide medical coverage through the Menasha Corporation retiree medical plan for persons retiring at or after age 65. Persons retiring at age 62 will pay 20% of the premium for this coverage between the ages of 62 & 65." (*Id.*) Section 3(b) of Article XV of the 1997 CBA was similar to that of the 1994 CBA, except that it required Defendant to pay 95% of employee and dependant health coverage rather than 100%, with the employee paying the remaining 5%. (Dkt. No. 28 Ex. 2, at 33.) The 1997 CBA did not contain a provision comparable to Section 7(a) of the 1994 CBA, though Section 7 of the 1997 CBA was identical to Section 7(b) of the 1994 CBA. (*Id.* at 34.) Both CBAs contained a provision stating: "This agreement may be amended at any time by mutual agreement of the parties hereto." (Dkt. No. 28 Ex. 1 at 68; Dkt. No. 28 Ex. 2, at 63.)

In 1996, Defendant issued a summary plan description ("SPD"), which was intended to be an "easy to read explanation of [employee] benefits." (Dkt. No. 28 Ex. 3, at 4.) Regarding employee health benefits, the SPD provided:

> If you retiree [sic] on or after June 17, 1994 and before July 1, 1997 you are eligible for the Blue Cross/Blue Shield Group Medical Plan as a retired employee if you retire from Menasha Corporation provided that on the date your employment ceased you are between the ages of 62 and 65 and you are immediately eligible to receive a benefit from the Menasha Corporation Retirement Income Plan . . . .
>
> Menasha Corporation shall contribute 80% of the premium when the employee is between the ages of 62 and 65. The retired employee will pay 20%. When the retired employee attains age 65, Menasha Corporation will contribute 100% of the premium. Menasha Corporation shall contribute 80% on behalf of a dependent spouse, the retired employee will pay 20%. When the dependent spouse attains age 65, Menasha Corporation shall contribute 100% of the premium.
>
> Effective July 1, 1997 the terms of the retiree group medical plan will not change except that the plan offered to persons retiring at or after age 62 will be the Menasha Retiree Group Medical Plan.

(Dkt. No. 28 Ex. 3, at 17.) Though these were the retiree health benefits recognized by the SPD, the SPD reserved to Defendant "the right to terminate the Plan at any time and for any reason," and warned plan participants that they "will lose all benefit coverage . . . if the Company decides to terminate the Plan." (Dkt. No. 28 Ex. 3, at 72.)

Plaintiff Gustave Peppel retired on March 1, 1995, Plaintiff Eleanor Rhodes retired on August 1, 1995, and Plaintiff Robert Moore retired on July 1, 1996, all at the age of 62, and all during the term of the 1994 CBA. Plaintiff Victor Adams retired on April 1, 1998, also at the age of 62, during the term of the 1997 CBA. Before Plaintiffs Eleanor Rhodes and Victor Adams announced their retirement, they met with representatives from the Menasha human resources department to discuss their retirement health benefits. Consistent

with the language describing retiree health benefits in the SPD, the Menasha representatives informed Plaintiffs Rhodes and Adams that, during retirement, Menasha would pay 80% of their healthcare premiums until they turned 65, at which point Menasha would pay 100% of the premiums. (Dkt. No. 29, Ex. 2 ¶ 11; Ex. 15 ¶ 3.)

Following the retirement of Plaintiffs Peppel, Rhodes, Moore, and Adams, Menasha did, in fact, pay 80% of the retirees' health insurance premiums, and 80% of the premiums of the retirees' spouses, until the retirees and the spouses turned 65, at which point Menasha paid 100% of the premiums. This practice continued until October of 2006 without objection from the company.

In 2003, Defendant issued another SPD ("2003 SPD"), which verified that "[a] retiree medical plan was agreed to by Menasha Corporation" for "Coloma union hourly employees represented by [L]ocal 1029 who were at least age 62 at the time of retirement and who retired on and after January 1, 1985 but prior to July 1, 1997." (Dkt. No. 29 Ex. 22, at 6.) The 2003 SPD also declared Defendant's right to "amend or terminate the plan at any time for any reason." (Dkt. No. 33 Ex. 4, at 35.)

In October of 2006, Menasha informed Plaintiffs that, beginning January 1, 2007, Menasha would no longer be paying 100% of the retirees' health insurance premiums. Menasha indicated that it would gradually decrease its contribution to retiree health insurance in accordance with the following schedule: from January 1, 2007 to April 30, 2008, each retiree would pay $60 per month, with Menasha paying the remainder; from May 1, 2008 to

April 30, 2009, each retiree would pay $120 per month, with Menasha paying the remainder; finally, from April 30, 2009 and continuing forward, Menasha would pay $100 per month, with the retiree paying the remainder.

On December 10, 2008, Plaintiffs filed suit under Section 301 of the LMRA, 29 U.S.C. § 185, and Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B) arguing that the 1994 and 1997 CBAs obligated Menasha to provide them with vested lifetime healthcare benefits, and that Menasha breached this obligation by decreasing the amount of its contribution from 2007 onward. Plaintiffs and Defendant have filed competing motions for summary judgment on Plaintiffs' claims.

## II. Law and Analysis

A party is entitled to summary judgment if the pleadings, discovery, and affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Summary judgment is appropriate if, interpreting the evidence in the light most favorable to the non-moving party, no rational juror could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986). The competing motions for summary judgment present two general issues for consideration: (1) whether the 1994 and 1997 CBAs provide lifetime health insurance benefits to Plaintiffs Robert Moore, Eleanor Rhodes, Gustave Peppel and Victor Adams, and their dependent spouses, Plaintiffs Marjorie Moore, Lorraine Peppel, and Naomi Adams; and (2) if the 1994 CBAs do provide lifetime health insurance benefits to Plaintiffs, whether

Defendant may unilaterally alter or terminate those benefits.

*1. Whether the 1994 and 1997 CBAs provide lifetime health insurance benefits to Plaintiffs*

Unlike ERISA pension benefits, ERISA welfare benefits do not automatically vest at retirement. Nevertheless, a company may voluntarily provide its employees with vested lifetime healthcare coverage after they retire. *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983); *see also Reese v. CNH Am. LLC*, 574 F.3d 315, 321 (6th Cir. 2009). When the ERISA-qualified health plan that contains the alleged promise of lifetime health insurance benefits stems from a collective bargaining agreement, the Court applies "'ordinary principles of contract interpretation' to determine whether benefits have vested." *Reese*, 574 F.3d at 321 (quoting *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 579-80 (6th Cir. 2006)).

In accordance with "ordinary principles of contract interpretation," "whether retiree insurance benefits continue beyond the expiration of the collective bargaining agreement depends upon the intent of the parties." *Yard-Man*, 716 F.2d at 1479. In ascertaining the intent of the parties, the Court must undertake a two step inquiry. First, the Court should "look to the explicit language of the collective bargaining agreement for clear manifestations of intent." *Id.* In conducting a review of the express contractual language, the Court should consider the context in which the language appears, and interpret each provision in question as part of the integrated whole. *Id.* Second, if the language and context of the CBA leave ambiguities regarding the intent of the parties, courts may consider extrinsic evidence to

ascertain intent. *Yolton*, 435 F.3d at 579. Though Plaintiffs are required to prove that a CBA

provides them with vested lifetime health benefits, Sixth Circuit courts employ a "nudge in

favor of vesting in close cases" on the theory that "it is unlikely that [welfare benefits] would

be left to the contingencies of future negotiations." *Id.* (citing *Yolton*, 435 F.3d at 579-80).

This "nudge" is known as the "*Yard-Man* inference," after *UAW v. Yard-Man, Inc.*, 716 F.2d

1476 (6th Cir. 1983), the case first establishing it.

Because the provisions addressing employee and former employee health benefits in

the 1994 CBA differ from the provisions in the 1997 CBA, the claims of employees that

retired while the 1994 CBA was in effect are treated differently than the claims of the

employee that retired while the 1997 was in effect. In addition, because the two CBAs treat

employees and former employees differently than they treat spouses of employees and former

employees, the claims of the spouses of former employees are treated differently than the

claims of the former employees themselves.

a. Former employees that retired while the 1994 CBA was in effect

Plaintiffs Robert Moore, Eleanor Rhodes and Gustave Peppel all retired under the

1994 CBA. Their claims for lifetime health insurance benefits are governed by the

representations made in that document. Whether the 1994 CBA grants lifetime health

insurance benefits to these plaintiffs depends on the intent of the parties in drafting Article

XV, Section 7(a) of the 1994 CBA, which states: "Employees reaching the age of 62 during

the term of this agreement shall be provided coverage under the Blue Cross/ Blue Shield of

Michigan Plan. These employees will pay 20% of the premium for this coverage until they reach age 65. At that time, company will pay 100% of premium for this coverage." (Dkt. No. 28 Ex.1, at 37.)

According to Defendant, the parties intended this provision to mean that employees reaching the age of 62 during the term of the 1994 CBA shall be provided coverage *only as long as they are active employees*. According to Plaintiffs, the parties intended this provision to mean that employees reaching the age of 62 during the term of the 1994 CBA shall be provided coverage *throughout retirement*.

Under the "ordinary principles of contract interpretation," the Court must first attempt to ascertain the intent of the parties by analyzing the express language of Section 7(a), while taking into account the broader contractual context in which the provision appears. *Yard-Man*, 716 F.2d at 1479. The express language of Section 7(a) appears to be ambiguous. Both parties offer reasonable interpretations.

Defendant argues that Section 7(a) extends health benefits only to active employees, and not to retirees, because Section 7(b) of the CBA explicitly provides that, after July 1, 1997, "persons retiring" are entitled to health benefits. (Dkt. No. 28 Ex. 1, at 37.) Defendant argues that, as indicated by Section 7(b), the parties knew how to provide for coverage to retirees, and the fact that Section 7(a) extends coverage only to "employees" means that retired persons were intentionally excluded. This argument has some merit. The fact that the 1994 CBA refers to "employees" in one provision and "persons retiring" in the next

9

suggests that the two provisions are intended to apply to different categories of individuals. However, this distinction may also merely be the result of imprecise contract drafting. It is possible that the real purpose of making Section 7(a) and Section 7(b) two distinct provisions is merely to switch the source of the insurance coverage from "the Blue Cross/ Blue Shield of Michigan Plan" to "the Menasha Corporation Retiree Medical Plan" after July 1, 1997, but to keep the two provisions identical in other respects.[1] Indeed, the 1996 SPD validates this theory by noting that "[e]ffective July 1, 1997 the terms of the retiree group medical plan will not change except that the plan offered to persons retiring at or after age 62 will be the Menasha Retiree Group Medical Plan." (Dkt. No. 28 Ex. 3, at 17.)

Plaintiff argues that, even though Section 7(a) does not explicitly apply to "persons retiring," it should be read like its neighbor, Section 7(b), to extend coverage to employees post-retirement because the coverage available to active employees is fully addressed in a different portion of 1994 CBA. Sections 1, 2, and 3(b) of Article XV of the 1994 CBA unambiguously provide active employees with health insurance to be paid at 100% by the company. (Dkt. No. 28 Ex. 1, at 35-36.) As Plaintiff argues, if Section 7(a) also addressed only active employees and not retired employees, as Defendant claims it does, then the 1994

---

[1]Defendant argues that to read Section 7(a) to apply to "persons retiring," like Section 7(b), would be to render Section 7(b) superfluous, because in such a case Section 7(b) would not add to or subtract from the rights or obligations already established by Section 7(a). This argument is incorrect. Section 7(b) provides for a different source of medical coverage than Section 7(a). Thus, even if Section 7(a) is read like Section 7(b) to extend coverage to employees *throughout retirement*, it alters the source of medical coverage and is not superfluous.

CBA would extend 100% health coverage to active employees under age 62, 80% health coverage to employees ages 63, 64, and 65, and 100% health coverage to employees over age 65. At oral argument, Defendant's counsel attempted to explain this peculiar treatment by arguing that the decreased payment for employees age 62 to 65 results from the interplay between social security benefits at those ages and the benefits provided by the CBA. The Court is not convinced that Defendant has adequately explained away the inconsistencies that result from its interpretation of Section 7(a). Defendant is correct that social security benefits can supplement an employee's benefits under an ERISA-qualified welfare plan, and that the amount of those social security benefits can depend, in part, on an employee's age, but an employee is entitled to social security benefits only after he or she retires. If Section 7(a) was intended to apply only to active employees, as Defendant argues, those employees would not be receiving any social security benefits while receiving the benefits provided by Section 7(a), and the payment reduction only for active employees between the ages of 62 and 65 would not be explained or rectified by any supplemental payments. Such treatment appears to violate Defendant's internal policy against age discrimination reflected in the 1994 CBA.[2] (*Id*. at 4, ("The Company, and the Union, agree no to discriminate against any employee because of age . . . .").) On the other hand, if Section 7(a) extends coverage to Menasha employees throughout retirement, as Plaintiffs argue, the payment reductions for employees between 62 and 65 created by Section 7(a) would align with the comparatively low payments afforded to retirees of those ages by the Social Security Administration.

---

[2]Plaintiff also points out that this peculiar treatment may violate the Age Discrimination in Employment Act, although this issue is not directly being litigated in this case.

In short, both interpretations advanced by the parties have weaknesses, but both are plausible. In light of the context provided by Article XV of the 1994 CBA, Section 7(a) can reasonably be read to extend coverage to employees only while they are active employees, and it can reasonably be read to extend coverage to employees throughout retirement. Because the express terms of the contract are ambiguous, the Court should consider extrinsic evidence to ascertain the intent of the parties.

The extrinsic evidence overwhelmingly indicates that the parties intended that Section 7(a) extend coverage to employees throughout retirement. First, the 1996 SPD[3] informs employees that:

> If you retire on or after June 17, 1994 and before July 1, 1997 [which Plaintiffs Robert Moore, Eleanor Rhodes and Gustave Peppel did] you are eligible for the Blue Cross / Blue Shield Group Medical plan *as a retired employee* if you retire from Menasha Corporation provided that on the date your employment ceased you are between the ages of 62 and 65 and you are immediately eligible to receive a benefit from the Menasha Corporation retirement Income Plan [which Plaintiffs Robert Moore, Eleanor Rhodes and Gustave Peppel were] . . . . Menasha Corporation shall contribute 80% of the premium when the employee is between the ages of 62 and 65. The *retired* employee will pay 20%. When the *retired* employee attains age 65, Menasha Corporation will contribute 100% of the premium.

(Dkt. No. 28 Ex. 3, at 17 (emphasis added).) Also, the 2003 SPD clarifies that the 1994 CBA

---

[3]Unless a SPD has been specifically incorporated into a CBA, it is extrinsic evidence. *See Golden v. Kelsey-Hayes Co.*, 954 F. Supp. 1173, 1186 (E.D. Mich. 1997). In this case, although the 1994 CBA references the 1996 SPD by saying that it will be distributed to the qualifying employees, this language is not sufficient to incorporate the terms of the SPD into the CBA, and so the SPD remains extrinsic evidence. *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 365 n.12 (6th Cir. 2009) (requiring more explicit language, such as the SPD "is hereby made part of this agreement," as a prerequisite to incorporation).

was intended to extend health insurance benefits to retirees throughout retirement, not just active employees, by stating that "[a] retiree medical plan was agreed to by Menasha Corporation for . . . employees . . who were at least age 62 at the time of retirement and who retired on and after January 1, 1985 but prior to July 1, 1997." (Dkt. No. 29 Ex. 22, at 6.) These provisions of the 1996 and 2003 SPDs, which Defendant itself drafted, are compelling indicators that the parties contemplated that Section 7(a) of the 1994 CBA would extend health coverage to employees throughout retirement.

Second, Menasha representative Jim Polshak informed Plaintiff Eleanor Rhodes prior to her retirement that employee healthcare coverage would continue during her retirement. (Dkt. No. 29, Ex. 2 ¶ 11.) This uncontradicted statement is not barred from consideration by the rule against hearsay because it fits within the exception for party admissions contained in Rule 801(d)(2)(D) of the Federal Rules of Evidence, and it is not barred from consideration by the parol evidence rule because parol evidence may be considered to clarify ambiguous contractual terms. *Carbonic Prods. Co. v. Welding & Cutting Supply Co.*, 823 F.2d 553, 1987 WL 38061, at *2 (6th Cir. July 17, 1987) (unpublished table decision). Mr. Polshak's representation that healthcare coverage would continue throughout an employee's retirement suggests that Defendant intended that Section 7(a) extend health coverage to retired employees, not just active employees. *See McCoy v. Meridian Auto Sys., Inc.*, 390 F.3d 417, 423-24 (6th Cir. 2004) (considering extrinsic evidence, including representations made by company employees to retirees, after finding the agreement itself ambiguous).

As further evidence that Plaintiffs offer the proper interpretation of Section 7(a), following each Plaintiffs' retirement, Defendant actually paid the insurance premiums in accordance with the arrangement set forth in Section 7(a) — 80% of the cost when Plaintiffs were between 62 and 65, and 100% of the cost when Plaintiffs were over 65 — until January 1, 2007. Besides Section 7(a), there appear to be no other provisions of the 1994 CBA that could possibly obligate Defendant to make these payments. Thus, Defendant was either paying Plaintiffs' retirement health benefits because it thought Section 7(a) obligated it to do so, or Defendant was paying Plaintiffs' retirement health benefits out of goodwill. Though it is possible that Defendant's payments resulted solely from goodwill, the admissions contained in the SPDs and the representations made to Plaintiff Eleanor Rhodes, as well as general economic considerations, strongly suggest that the payments resulted from a sense of obligation. Defendant's apparent belief that Section 7(a) obligated Defendant to pay for Plaintiffs' retirement health benefits suggests that Defendant intended Section 7(a) to extend health benefits to retired employees, not just active employees, when it entered into the 1994 CBA.

Though the express terms of the CBA are ambiguous, extrinsic evidence clearly indicates that the parties, including Defendant, intended that Section 7(a) extend healthcare benefits to retired employees, not just active employees. The *Yard-Man* inference, which provides "a nudge in favor of vesting," strengthens this conclusion. *See Reese*, 574 F.3d at 321. The extrinsic evidence is undisputed and so overwhelming that no reasonable fact

finder could determine that the parties did not intend to extend lifetime health insurance benefits to retired employees through the 1994 CBA.

b. Former employee that retired while the 1997 CBA was in effect

Plaintiff Victor Adams retired under the 1997 CBA. His claim for lifetime health insurance benefits is governed by the representations made in that document. Whether the 1997 CBA grants lifetime health insurance benefits to Plaintiff Victor Adams depends on the intent of the parties in drafting Article XV, Section 7 of the 1997 CBA, which states: "[e]ffective July 1, 1997, the Company will provide medical coverage through the Menasha Corporation Retiree Medical Plan for persons retiring at or after age 65. Persons retiring at age 62 will pay 20% of the premium for this coverage between the ages of 62 & 65." (Dkt. No. 28 Ex. 2, at 34.)

Unlike Section 7(a) of the 1994 CBA, this provision explicitly indicates that it extends coverage to "retiring persons." Nevertheless, Defendant argues that Section 7 does not extend 100% lifetime benefits to retirees because Section 7 only obligates Defendant to provide an undefined amount of "coverage;" it does not obligate Defendant to provide "*100% coverage for life*."

Defendant's argument is meritless. Section 7 unequivocally states that "persons retiring at or after age 65" will receive medical coverage. It is more reasonable to assume that the lack of limitations on the duration and amount of Defendant's obligation to provide medical coverage to retirees means that there are no such limitations, not that Defendant is

free to provide coverage in an amount that it chooses and to terminate the benefits whenever it chooses. This is especially true in light of the express temporal and percentage limitations on Defendant's obligation to provide other types of insurance found in other nearby provisions of the 1997 CBA. *See Reese*, 574 F.3d at 323 (noting that the absence of a durational limitation in one clause means that there is no durational limitation when such a limitation appears in other clauses); *Yolton*, 435 F.3d at 581-82 (same); *Noe v. PolyOne Corp.*, 520 F.3d 548, 562-63 (6th Cir. 2008) (same); *Cole v. ArvinMeritor, Inc.*, 516 F. Supp. 2d 850, 870 (E.D. Mich. 2005) (same); *Golden v. Kelsey-Hayes Co.*, 954 F. Supp. 1173, 1187 (E.D. Mich. 1997) (same). If Defendant meant to include a durational or percentage limitation on its obligation to provide coverage, it would have done so, as it did in Sections 2, 3(a), 4, 5, and other portions of Section 7 itself. And again, the *Yard-Man* inference, which provides "a nudge in favor of vesting," strengthens this conclusion. *See Reese*, 574 F.3d at 321.

Even if the Court were to agree that Section 7 is ambiguous as to whether it obligates Defendant to "provide medical coverage" in full to a retiree for life, or whether Defendant can unilaterally control the amount and duration of the coverage it provides, the extrinsic evidence clearly indicates that the parties intended Section 7 to extend health insurance to retirees for life. Before Plaintiff Victor Adams retired, he spoke with Menasha human resources manager Brian Greenbush who informed him that, after he retired, Menasha would pay his health insurance benefits in full for the rest of his life. (Dkt. No. 29, Ex. 14 ¶ 3.) Mr.

16

Greenbush's representations are admissible under the exception to the rule against hearsay for party admissions and the exception to the parol evidence rule for statements used to clarify ambiguous terms.

On its face, Section 7 of the 1997 CBA clearly obligates Defendant to provide lifetime health insurance benefits to employees that retire under the 1997 CBA, and the *Yard-Man* inference and extrinsic evidence only strengthen this conclusion.

c. Spouses of former employees

Plaintiffs Marjorie Moore, Lorraine Peppel, and Naomi Adams ("spouse Plaintiffs") are the dependent spouses of Plaintiffs Robert Moore, Gustave Peppel and Victor Adams. The spouse Plaintiffs also claim that the 1994 and 1997 CBAs obligated Menasha to provide them with insurance benefits after their husbands retired. The claims of the spouse Plaintiffs are based on the same contractual provisions as the claims of their husbands; Plaintiffs Marjorie Moore and Lorraine Peppel claim that Section 7(a) of the 1994 CBA entitles them to benefits after their husbands' retirements, and Plaintiff Naomi Adams claims that Section 7 of the 1997 CBA entitles her to health benefits after the retirement of her husband. Though, as discussed above, it is not clear from the face of Section 7(a) of the 1994 CBA whether the provision extends coverage to only active employees or to retired employees, it is clear from the face of Section 7(a) that it does not cover spouses. Likewise, Section 7 of the 1997 CBA extends coverage to "persons retiring," but makes no mention of spouses, and cannot be reasonably interpreted to cover spouses. Thus, the express terms of the two CBAs

indicate that retiree coverage does not cover spouses. Plaintiff argues that the extrinsic evidence, including the SPD and representations made by Menasha representatives, indicates that spouses are entitled to receive benefits throughout their husbands' retirement. However, because the two CBAs are not ambiguous in that they clearly fail to extend coverage to spouses, the extrinsic evidence may not be considered. *See Yolton*, 435 F.3d at 579. Defendant is entitled to summary judgment on the claims of the spouse Plaintiffs.

*2. Whether Menasha may alter or terminate lifetime health benefits*

The above discussion indicates that Section 7(a) of the 1994, read in light of the persuasive extrinsic evidence, clearly obligates Defendant to provide health insurance to Plaintiffs Robert Moore, Eleanor Rhodes, and Gustave Peppel throughout their retirement, and that Section 7 of the 1997 CBA clearly obligates Defendant to provide health insurance to Plaintiff Victor Adams throughout his retirement. However, Defendant argues that, even if Sections 7(a) and 7 do obligate Defendant to provide health insurance to retired employees, Defendant retained the right to alter or terminate that obligation unilaterally.

Defendant argues that a "reservation of rights clause" in the 1996 and 2003 SPDs affords it the ability to unilaterally terminate Plaintiffs' retirement health benefits. The reservation of rights clause states:

> [T]he Company reserves the right to terminate the Plan at any time and for any reason. If the Plan is amended or terminated you and other active and retired employees may not receive benefits as described in other sections of this [SPD]. You may be entitled to receive different benefits under different conditions. However, it is possible that you will lose all benefit

> coverage. This may happen at any time, even after you retire, if the Company decides to terminate the Plan or your coverage under the Plan. In no event will you become entitled to any vested rights under this Plan.

(Dkt. No. 28 Ex. 3, at 72 (1996 SPD); Dkt. No. 33 Ex. 4, at 35 (2003 SPD).)

The Sixth Circuit has recognized that an SPD that contains a clause reserving to the employer the right to unilaterally alter or terminate coverage provided by a CBA is valid in some circumstances, even if the SPD is distributed after the effective date of the CBA, and even if the SPD has not explicitly been incorporated into the CBA,[4] as is the case here. *Reese*, 574 F.3d at 323 (citing *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 444 (6th Cir. 2007)). However, there are two exceptions to this rule. First, the reservation of rights clause in the SPD must be "unqualified," meaning there must not be language in the SPD indicating that the SPD is subject to and controlled by the provisions of the CBA. *Prater*, 505 F.3d at 444; *McCoy*, 390 F.3d at 425 (indicating that a SPD is "qualified" if it is "subject to the provisions of any applicable collective bargaining agreement"). Second, there must not be language in the CBA indicating that the CBA represents the full commitment between the parties or that the CBA cannot be amended without signed mutual consent. *Prater*, 505 F.3d

---

[4]If the SPD has been explicitly incorporated into a CBA, and the provisions of the SPD become provisions of the CBA, through language appearing in the CBA such as the SPD "is hereby made part of this agreement," a reservation of rights clause can be read on equal footing with the other terms in the CBA. *See Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 365 n.12 (6th Cir. 2009). In this case, the only reference to the SPD contained in the CBAs appears in Section 3 of Article XV, which states "[a] Summary Plan Description shall be distributed to all members of [the union]." This language is not sufficient to explicitly incorporate the provisions of the SPD into the CBA.

at 444-45; *see also Reese*, 574 F.3d at 323. Both exceptions are intended to preserve the principle that an employer should generally not be able to unilaterally alter the terms of a collectively bargained agreement, *see Prater*, 505 F.3d 443-45, and to allow unilateral alterations only when union representatives would be expected to object to them but have not, *see Reese*, 574 F.3d at 323; *McCoy*, 390 F.3d at 425.

Plaintiffs first argue that the reservation of rights clause is not "unqualified." Plaintiff directs the Court's attention to a clause in the SPD stating that "your rights and benefits under the plan are determined by the actual provisions of the plan and any related policies or contracts. If the terms of the Summary Plan Descriptions and Certificate of Coverage differ from the plan and policy, the plan and policy will govern." (Dkt. No. 28, Ex. 3, at 3.) However, as Defendant correctly points out, this language only qualifies the portion of the SPD that relates to "Basic Life Insurance and Basic Accidental Death & Dismemberment Insurance." (*Id.*) It does not qualify the portion of the SPD that relates to "Medical Benefits," which are addressed in the paragraph immediately following the above cited passage. (*Id.*) In addition, there is no language in the SPD indicating that the provisions of the SPD addressing medical benefits are subject to and controlled by the provisions of the CBA. Thus, at least with regard to its discussion of medical benefits, the SPD is unqualified.

Plaintiffs also argue that the second exception applies because the CBA contains a clause stating that it cannot be amended without written mutual consent. Section 4 of Article XXVI of both the 1994 and 1997 CBAs states: "This Agreement may be amended at any

time by mutual agreement of the parties hereto." (Dkt. No. 27, Ex. 1, at 68; Dkt. No. 27, Ex. 2, at 63.) This provision must be interpreted to mean that the CBAs can *only* be amended by mutual consent, because any other interpretation would render the provision unnecessary. *See Noe*, 520 F.3d at 552 (discouraging reading a contract to create superfluous provisions). Defendant acknowledges that the CBAs contain such a provision, but Defendant argues that, for the second exception to apply, the CBA must contain a representation that the CBA embodies the complete agreement between the parties, or a "zipper" clause. However, in *Prater* the Sixth Circuit unequivocally held that "when a contract contains formal procedures requiring mutual, written assent to amend, that language preempts future unilateral termination of rights." 505 F.3d at 444. This rule honors the principle that "a plan summary 'cannot vitiate contractually vested *or bargained-for-rights*.'" *Id.* (emphasis in original) (citing *Halliburton Co. Benefits Comm. v. Graves*, 463 F.3d 360, 378 (5th Cir. 2006)). To allow Defendant to unilaterally terminate the retiree benefits provided by the CBAs would patently offend Article XXVI, Section 4 of the CBAs, and it is not reasonable to expect the union members to object to the reservation of rights clause in the SPD in light of Section 4. Because the 1994 and 1997 CBAs "explicitly said that their bargained for rights could not be terminated [without mutual consent]," the SPDs "cannot . . . be interpreted to permit the unilateral termination" of Plaintiffs' contractual rights. *Id.* at 445.

Citing *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995), Defendant also argues that employers generally have the right to modify or terminate ERISA welfare

plans at any time, and that Article XXVI, Section 1 of the 1994 CBA permits Defendant to retain any rights provided by law absent an express waiver.  However, as discussed above, Section 7(a) extends lifetime welfare benefits to Plaintiffs, and Section 4 of Article XXVI of the CBAs prevents Defendant from taking these benefits away absent mutual agreement. Thus, Section 4 of Article XXVI constitutes the "express waiver" of Defendant's right to terminate the welfare benefits that is required by Section 1 of Article XXVI.

### III. Conclusion

Section 7(a) of the 1994 CBA and Section 7 of the 1997 CBA, read in light of the extrinsic evidence and the *Yard-Man* inference, clearly promise Plaintiffs  Robert Moore, Eleanor Rhodes, Gustave Peppel, and Victor Adams lifetime health insurance benefits throughout retirement.  In addition, Defendant may not rely on language in the 1996 and 2003 SPDs to unilaterally divest these Plaintiffs of the promised benefits because the CBAs provide that they cannot be amended without the consent of both parties.  Thus, Plaintiffs Moore, Eleanor Rhodes, Gustave Peppel, and Victor Adams are entitled to summary judgment on their claims for lifetime health insurance benefits.  However, neither Section 7(a) of the 1994 CBA nor Section 7 of the 1997 CBA can reasonably be read to extend health insurance benefits to spouses of retired employees, and, because the contractual language is clear, Defendant is entitled to summary judgment on the claims for lifetime health insurance benefits brought by Marjorie Moore, Lorraine Peppel, and Naomi Adams.

An order and judgment consistent with this opinion shall be entered.

Dated: July 15, 2010                     /s/ Robert Holmes Bell
                                         ROBERT HOLMES BELL
                                         UNITED STATES DISTRICT JUDGE